

FILED

RECEIVED CLERK

2001 ... .. P 5: 20

U.S. DISTRICT COURT
DISTRICT OF UTAH
FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

**SEP 1 2 2001**

MARKUS B. ZIMMER, CLERK
BY_____
DEPUTY CLERK

Alan L. Sullivan (3152)
Michael D. Zimmerman (3604)
Todd M. Shaughnessy (6651)
SNELL & WILMER L.L.P.
15 West South Temple, Suite 1200
Gateway Tower West
Salt Lake City, Utah  84101-1004
Telephone:  (801) 257-1900
Facsimile:  (801) 257-1800

Charles R. Work, Esq.
Kenneth L. Cage, Esq.
Daniel A. Mullen, Esq.
Douglas G. Edelschick, Esq.
McDERMOTT, WILL & EMERY
600 13th Street, N.W.
Washington, D.C.  20005-3096
Telephone:  (202) 756-8000

Attorneys for Plaintiffs

---

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| PRECISION VASCULAR SYSTEMS, INC.; STERTZER FAMILY TRUST; GERALD AND MYRA S. DORROS IRREVOCABLE TRUST; DORROS FAMILY PARTNERS LIMITED; VICHON NEVELLE S.A.; FORRESTAL SAN JOSE S.A.; COMMERCIAL SAN ANTONIO S.A.; PUMA HOLDING CO.; and PINECREEK ENTERPRISES, INC., | **FIRST AMENDED COMPLAINT AND JURY DEMAND** |
| Plaintiffs, | |
| v. | Civil No. 2:01CV0564C |
| SARCOS L.C.; SARCOS SERVICES L.C.; SARCOS RESEARCH CORP.; SARCOS GROUP LP; SARCOS ENGINEERING | U.S. District Judge Tena M. Campbell |



CORP.; SARCOS MICROSENSORS INC.;
SARCOS MEDICAL CORPORATION;
SARCOS MICROSYSTEMS INCORPO-
RATED; SARCOS MICRO SYSTEMS L.C.;
SARCOS DEVELOPMENT CORPORATION;
SARCOS REHABILITATION SYSTEMS,
INC.; MICROJECT, INCORPORATED
(UTAH); MICROJECT, INCORPORATED
(DELAWARE); ANIMATE SYSTEMS
INCORPORATED; PROGRAMMABLE
DOSING SYSTEMS, INC.; SARCOS
ENTERTAINMENT CORPORATION;
SARCOS ENTERTAINMENT SYSTEMS,
INC.; INTERACTIVE TELECOMMUNICA-
TIONS CORPORATION; INTELLIGENT
MICROFUSION SYSTEMS; SARCOS
MANUFACTURING L.C.; STEPHEN C.
JACOBSEN, Ph.D.; FRASER M. SMITH,
Ph.D.; J. GORDON HANSEN, ESQ.; JOHN
DOE INC. 1-10; JOHN DOE L.C. 1-10; JOHN
DOE PARTNERS 1-10; and JOHN DOE
CORP. 1-10,

      Defendants.

     Plaintiff Precision Vascular Systems, Inc. ("PVS"), on its own and on behalf of its

shareholders and together with its individual shareholders, Stertzer Family Trust, Gerald and

Myra S. Dorros Irrevocable Trust, Dorros Family Partners Ltd., Vichon Nevelle S.A., Forrestal

San Jose S.A., Commercial San Antonio S.A., Puma Holding Co. and Pinecreek Enterprises, Inc.

(collectively, the "Individual Investors"), complain of Defendants Stephen C. Jacobsen, Ph.D.,

Fraser Smith, Ph.D., J. Gordon Hansen, Esq., and the "Sarcos Entities," including Sarcos L.C.,

Sarcos Services L.C., Sarcos Research Corporation, Sarcos Group L.P., Sarcos Engineering

Corp., Sarcos Microsensors Inc., Sarcos Medical Corporation, Sarcos Microsystems, Inc., Sarcos

Micro Systems L.C., Sarcos Development Corporation, Sarcos Rehabilitation Systems, Inc.,

Microject Inc., Animate Systems, Inc., Programmable Dosing Systems, Inc., Sarcos

39884.0001\ 182261.1

Entertainment Corporation, Sarcos Entertainment Systems, Inc., Interactive Telecommunications Corp., Intelligent Microfusion Systems, Sarcos Manufacturing L.C., and the "Doe" Defendants (collectively, the "Defendants") for the following causes of action, and allege as follows:

## NATURE OF ACTION

1.      PVS and the Individual Investors seek to remedy the Defendants' tortious and illegal conduct directed at them.  Stephen C. Jacobsen, with Fraser M. Smith, J. Gordon Hansen and the Sarcos Entities, engaged in a systematic and unlawful scheme to:  (1) create new companies, (2) induce private investment in securities issued by those companies, (3) transfer assets from those companies to a Sarcos Entity that is wholly owned by Jacobsen, and (4) leave those stripped companies, together with their investors, to founder and die.

2.      To these ends, Jacobsen and the Defendants violated federal and Utah securities laws as well as state law and breached their fiduciary duties to PVS and the Individual Investors by engaging in a calculated and deliberate scheme to pillage PVS assets for their own gain. Specifically, the Defendants: (1) violated federal and Utah securities laws by affirmatively misrepresenting material facts to the Individual Investors concerning the value of PVS, its intellectual property and management to induce them to invest in PVS; (2) breached their fiduciary duties to PVS by entering into self-dealing transactions that were unfair to PVS and that siphoned money and other assets from PVS to the Defendants; (3) misappropriated PVS's corporate opportunities; (4) interfered with PVS's relationships with its employees; (5) misappropriated and converted PVS's assets, including, but not limited to, PVS's patents, trade secrets, confidential information and other intellectual property; and (6) conspired to

-3-

prevent PVS from raising new capital in an attempt to force a forfeiture of PVS's intellectual property.

3.    To remedy the Defendants' conflicts of interest and their deliberate, malicious, tortious, and illegal conduct, PVS and the Individual Investors seek, as appropriate, compensatory and punitive damages, treble damages under the Utah Uniform Securities Act, an accounting and disgorgement of the Defendants' ill-gotten benefits and profits, injunctive relief to stop Defendants' ongoing tortious conduct directed at PVS and its shareholders, attorneys' fees, costs, pre- and post-judgment interest, and any such other relief as the Court deems appropriate.  PVS also seeks a declaratory judgment that relevant intellectual property belongs to PVS and not to Sarcos L.C. and that Sarcos L.C. must either transfer all right, title and interest, or grant license rights to PVS, as appropriate.  Moreover, PVS seeks a declaratory judgment that certain noncompetition agreements are not enforceable against PVS employees.

## PARTIES PLAINTIFF

4.    PVS is a Utah corporation with its principal place of business in West Valley City, Utah.  PVS is a privately held corporation that specializes in the research, development and commercialization of neurovascular and other medical devices.  Defendant Jacobsen originally incorporated PVS in 1996 as a wholly-owned subsidiary of Sarcos Inc.  The corporate mission of PVS is to research, develop, and commercialize new neurovascular and other medical devices.  PVS has several products currently in production and recently began to sell its line of Synchro neurovascular guidewires.  Sarcos Inc., later named SIM, Inc., merged into PVS on December 31, 1999.

5.      The Stertzer Family Trust is a trust organized under the laws of California for the purposes of estate planning and investment.  It purchased 1,111,111 shares of PVS Series A Preferred stock on June 22, 1998 and has held them continuously since that time.

6.      The Gerald and Myra S. Dorros Irrevocable Trust is a trust organized under the laws of Wisconsin for estate planning purposes.  It purchased 944,444 shares of PVS Series A Preferred stock on June 22, 1998 and has held them continuously since that time.

7.      Dorros Family Partners Limited is a California limited partnership for the purposes of estate planning and investment.  It purchased 166,667 shares of PVS Series A Preferred stock on June 22, 1998 and has held them continuously since that time.

8.      Vichon Nevelle S.A. is a personal holding company organized under the laws of Uruguay for investment purposes.  It purchased 1,000,000 shares of PVS Series A Preferred stock on June 22, 1998 and has held them continuously since that time.

9.      Forrestal San Jose S.A. is a personal holding company organized under the laws of Panama for investment purposes.  It purchased 55,556 shares of PVS Series A Preferred stock on June 22, 1998 and has held them continuously since that time.

10.      Commercial San Antonio S.A. is a personal holding company organized under the laws of Panama for investment purposes.  It purchased 55,556 shares of PVS Series A Preferred stock on June 22, 1998 and has held them continuously since that time.

11.      Puma Holding Company is a personal holding company organized under the laws of the Bahamas for investment purposes.  It purchased 555,556 shares of PVS Series A Preferred stock on June 22, 1998 and has held them continuously since that time.

39884.0001\ 182261.1

12.    Pinecreek Enterprises, Inc. is a personal holding company organized under the laws of the British Virgin Islands for investment purposes. It purchased 277,778 shares of PVS Series A Preferred stock on June 22, 1998 and has held them continuously since that time.

## PARTIES DEFENDANT

13.    Upon information and belief, Stephen C. Jacobsen, Ph.D. is an engineer and inventor of various technologies. In 1983, Jacobsen founded Sarcos Inc. In 1996, Jacobsen founded PVS as a wholly-owned subsidiary of Sarcos Inc. From the time of PVS's incorporation until his resignation on January 5, 2001, Jacobsen served as a director and chairman of the board of PVS. From the time of PVS's incorporation until September 2000, Jacobsen also served as CEO of PVS. Until Sarcos Inc. merged (under the name SIM, Inc.) into PVS on December 31, 1999, Jacobsen also served as a director and president of Sarcos Inc. Upon information and belief, Jacobsen is the director, president, manager, and sole member of defendant Sarcos L.C. Jacobsen currently owns or controls approximately 31% of the common shares and 34% of the preferred shares of PVS, as well as options for additional preferred shares. Upon information and belief, Jacobsen owned approximately 66% of SIM, Inc. (previously Sarcos Inc.) at the time it merged with PVS. Sarcos L.C., which is wholly controlled by Jacobsen, owns approximately 1.2% of the preferred shares of PVS.

14.    Upon information and belief, Fraser Smith, Ph.D. was a vice president and director of PVS from the time of its incorporation until his resignation on January 5, 2001. Smith was also the corporate secretary of PVS from July 6, 2000 until his resignation on January 5, 2001. Smith is executive vice president of Sarcos L.C. and currently owns approximately 3.1% of the common shares and 1.4% of the preferred shares of PVS, as well as

-6-

options for additional preferred shares. Smith also owned shares of SIM, Inc. (previously Sarcos Inc.) at the time it merged with PVS.

15.     Upon information and belief, J. Gordon Hansen, Esq. is a lawyer and partner at the law firm of Parsons, Behle & Latimer in Salt Lake City, Utah, and has represented Jacobsen, Smith, Sarcos Inc., SIM, Inc., Sarcos Services L.C., Sarcos L.C., and PVS, as well as all other Sarcos Entities. Hansen was PVS's corporate counsel and, as such, represented PVS in a multitude of corporate matters, including drafting employment agreements and equity compensation plans, drafting and negotiating assignments and licenses of intellectual property between Sarcos Inc. and PVS, creating alleged lease and service agreements between Sarcos L.C. and PVS and various other corporate matters. The license and assignment agreements drafted by Hansen on behalf of both PVS and Sarcos Inc. are now the subject of a private arbitration originally brought against PVS by Hansen's firm on behalf of Sarcos L.C. The alleged lease and services agreements are now the subject of a state court action originally brought against PVS by Hansen's firm on behalf of Sarcos L.C.[1] Hansen also served as the corporate secretary of PVS from at least March 1997 through July 6, 2000. Hansen held shares in Sarcos Inc. (then called SIM, Inc.) before it merged into PVS on December 31, 1999, and has been a shareholder of 0.68% of the Series A Preferred stock of PVS since that merger. Hansen served as a registered agent for PVS from its incorporation in February 1996 until February 28, 2001.

---

[1] *Sarcos L.C. v. Precision Vascular Systems, Inc.*, Civil No. 010902322, filed March 16, 2001 in the Third Judicial District Court in and for Salt Lake County, Utah.

39884.0001\ 182261.1

16.     Upon information and belief, Sarcos L.C. is a Utah limited liability company with its principal place of business in Salt Lake City, Utah.  Sarcos L.C. was formed in or around January 1999, and was known as S. Jacobsen L.C. until approximately April 1999.  Sarcos L.C. is a privately held company wholly owned by defendant Jacobsen. Sarcos L.C. owns approximately 1.2% of the preferred shares of PVS.  PVS is unaware of the business purpose of Sarcos L.C.

17.     Upon information and belief, the remaining Sarcos Entities, including Sarcos Services L.C., Sarcos Research Corporation, Sarcos Group LP, Sarcos Engineering Corp., Sarcos Microsensors Inc., Sarcos Medical Corporation, Sarcos Microsystems, Inc., Sarcos Micro Systems L.C., Sarcos Development Corporation, Sarcos Rehabilitation Systems, Inc., Microject Inc., Animate Systems, Inc., Programmable Dosing Systems, Inc., Sarcos Entertainment Corporation, Sarcos Entertainment Systems, Inc.,  Interactive Telecommunications Corp., Intelligent Microfusion Systems, and Sarcos Manufacturing L.C., John Doe, Inc. 1-10, John Doe L.C. 1-10, John Doe Partners 1-10, John Doe Corp., 1-10, are alter egos of Stephen C. Jacobsen and/or Sarcos L.C. that do not practice corporate formalities and were created to defraud investors and shareholders.

## JURISDICTION AND VENUE

18.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 because some of the causes of action alleged herein arise under federal securities laws.  This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

39884.0001\ 182261.1

19.     Venue is proper within this judicial district under 28 U.S.C. § 1391(b) and (c) as a substantial part of the events giving rise to PVS's claims occurred in the Central District of Utah. In addition, all of the Defendants are subject to personal jurisdiction in this District.

## FACTS COMMON TO ALL COUNTS

20.     Jacobsen founded Sarcos Inc. in 1983 to exploit various technologies and was its director, president, and CEO.  Jacobsen founded PVS in 1996 as a wholly-owned subsidiary of Sarcos Inc. to exploit catheter and guidewire technology invented by John Lippert, who became PVS's president.  Thereafter, Sarcos Inc. was experiencing financial difficulties and had lost many employees.  In early 1998 when Jacobsen realized that he needed funding in order to keep Sarcos Inc. solvent, Jacobsen devised a scheme to use PVS to improve Sarcos Inc.'s financial situation.

21.     On or about February 24, 1998, Jacobsen and Lippert flew to California and met with Dr. Simon Stertzer in Palo Alto for the purpose of soliciting an investment in PVS by Dr. Stertzer and other investors known to Dr. Stertzer.  Communications between Jacobsen and Dr. Stertzer regarding a possible investment in PVS continued through March and April of 1998.  On April 23, 1998, Dr. Stertzer personally introduced Dr. Gerald Dorros to Jacobsen, and Jacobsen expanded his attempts to solicit significant funding to include Dr. Dorros and other investors known to Dr. Dorros.  Communications between the Individual Defendants and the Individual Investors regarding a possible investment in PVS continued through May and June of 1998. These communications during the February to June period were in person, by telephone, via facsimile, via electronic mail, and through the mails.  During these communications, the Individual Defendants lied to the Individual Investors and cheated them out of $7.5 million.

-9-

## Defendants Assigned Non-Existent Technology to PVS

22.     During these discussions, Jacobsen and Hansen represented to the Individual

Investors on numerous occasions that Sarcos Inc. was licensing and/or assigning to PVS rights to

at least 26 different technologies that were either patented or in the process of being patented.

For example, Jacobsen and Hansen represented that Sarcos Inc. was assigning to PVS the

following six technologies in a fax to attorneys for Dr. Stertzer dated June 4, 1998:

- Micromachined Catheter for Guidewire-Free Operation
  (Standard and flow directed catheters)

- Catheter delivered Micro-implant system
  (Bio-errodable micro-implants, of variable shapes, materials and drug
  formulation, for programed drug release)

- Catheter Based System for Delivery of Genetically Altered Cells
  (Multi-Cell implantation micro system for myogenisis)

- Hollow micromachined tube configured as tendon lockable stent
  (System of internal/external tendons deploy and lock size of stent coil)

- Ultrasonic Actuation of Therapeutic Tips
  (Vibration driven actuator to produced [sic] desired movements for
  therapeutic actions of a micro-tip (total occlusion, arthrectomy, etc.))

- Piezoelectric Micro Element, with electrodes, for Tip Vibration
  (Multimodal tip vibration for lubricity, cutting, ablation, and/or sensing.)

Jacobsen and Hansen repeated this representation to all the Individual Investors on or after June

22, 1998, and further embellished it by adding Thorpe North & Western LLP invention

disclosure file numbers T6958, T6962, T6963, T6964, T6965, and T6966, respectively, to

descriptions of the aforementioned six technologies in the Technology Assignment Agreement

(the "Assignment Agreement") and the Amended and Restated Exclusive License Agreement

("License Agreement") between Sarcos Inc. and PVS (collectively, the "Agreements").

-10-

23.     Jacobsen and Hansen's representations concerning the aforementioned six technologies were false because the purportedly assigned invention disclosure files were devoid of any patents, invention disclosures, inventor notes, or substance.  By making these false representations, Jacobsen and Hansen misled the Individual Investors and caused them to believe that PVS owned substantially more intellectual property than it really did.

24.     Jacobsen knew at the time these statements were false and misleading because he made up names for intellectual property that did not exist, embellished descriptions of the intellectual property, and directed the addition of invention disclosure file numbers, since Jacobsen did not think that the existing list of technologies provided to him by the president of PVS looked positive enough for a selling document.  Jacobsen intentionally misrepresented the value, scope and ownership of PVS's intellectual property in an effort to deceive the Individual Investors concerning the true value of PVS and to induce them to invest in PVS.

## Defendants Secretly Eviscerated The Fields of Use for PVS Technology

25.     In addition to purporting to assign non-existent technologies to PVS, the Individual Defendants pulled a bait and switch with existing Sarcos Inc. technologies.

26.     Jacobsen and Hansen unequivocally represented to Dr. Dorros and Dr. Stertzer on numerous occasions, and through them to all the Individual Investors, that Sarcos Inc. had assigned to PVS all rights to medical applications of various technologies developed for the United States government defense and intelligence communities and other industries.  Jacobsen also personally represented to Dr. Dorros and Dr. Stertzer, beginning on or about April 23, 1998 and continuing on several occasions thereafter, and that PVS owned or had rights to all "Sarcos" technology related to human medical uses, that PVS was developing products using that

-11-

technology for existing medical applications (including cardiology, complex coronary artery disease, thrombolysis, total occlusion, bleeds, tumor, liver cancer, peripheral vascular disease). Dr. Dorros told Jacobsen that he wanted PVS to use that technology for site-specific chemotherapy and other applications.

27.     In a facsimile dated June 4, 1998, Jacobsen and Hansen represented to Dr. Stertzer's attorneys that Sarcos Inc. was assigning to PVS technologies for applications in the following "Fields of Use":

> 1. Intravascular human medical applications including:
>    a. Cardiology
>    b. Peripheral Radiology
>    c. Neuroradiology;
>
> 2. Human urology and gynecology, including reproductive health; and,
>
> 3. Human gastroenterology

28.     These Fields of Use define the scope of PVS's technology rights and, as PVS's primary asset, were material, if not central, to the Individual Investors' decision to invest in PVS. An earlier draft of the Agreements dated May 21, 1998 had narrower Fields of Use that did not include gynecology and human gastroenterology, but these applications were added when Dr. Stertzer specifically asked Jacobsen to do so and were reflected in Hansen's June 4, 1998 facsimile.

29.     In or before June 1998, Smith became the principal architect of a scheme with Jacobsen to eviscerate the aforementioned Fields of Use from the Agreements.  Smith and Jacobsen wanted to prevent PVS from using the assigned and licensed technologies for several lucrative applications involving dialysis, site-specific thrombolysis, and site-specific chemotherapy, because a Sarcos Entity had ongoing projects in those areas.  Rather than

-12-

negotiate in good faith to exclude those areas from the Fields of Use in the Agreements, Smith conspired with Jacobsen to secretly insert the exclusions to avoid detection. On June 11, 1998, Smith and Jacobsen discussed their strategy to insert exclusions into an exhibit, rather than in the text of the Agreements, to avoid setting off alarms with some or all of the Individual Investors and their attorneys.

30.     Smith and Jacobsen conspired with Hansen to accomplish this scheme. Jacobsen and Smith knew that Hansen represented in a June 23, 1998 letter to Dr. Stertzer's attorneys that he was enclosing final copies of the Agreements to be signed as enclosed. Hansen's June 23, 1998 letter was copied to Jacobsen and Smith. Neither Hansen's June 23, 1998 letter nor the enclosed Agreements made reference to any exclusions from the Fields of Use. Only after the Individual Investors had signed on the dotted line and transferred $7.5 million to PVS, Smith, Jacobsen, and/or Hansen inserted the following exclusions to the Fields of Use into the Agreements: (a) Dialysis; (b) Site-specific thrombolysis; and (c) Site-specific chemotherapy. These exclusions appear on a single page buried among approximately 175 pages of transaction documents that were not sent to the Individual Investors or their attorneys until months after June 23, 1998. The Individual Defendants never specifically disclosed to the Individual Investors that exclusions to the Fields of Use had been inserted into the Agreements. The exclusions to the Fields of Use are not part of the Agreements.

31.     After the June 1998 transaction closed, Jacobsen actively engaged in efforts to prevent the Individual Investors from discovering the exclusions to the Fields of Use. In or before July 1998, Jacobsen planned for a Sarcos Entity to utilize a micromachining apparatus and method (the "Micromachine") to make certain Micromachined catheters, all of which had

been either licensed or assigned to PVS, for manufacture and sale with a pump in areas secretly

excluded from the Fields of Use. Jacobsen instructed an employee of a Sarcos Entity to prepare

a business plan featuring this technology. The Sarcos employee originally included a picture of a

Micromachined catheter and pump in the Sarcos Entity's business plan, but Jacobsen had the

picture removed because he believed that Dr. Dorros would see it. Jacobsen did not want Dr.

Dorros to see the picture because Jacobsen knew that Dr. Dorros believed PVS owned the

exclusive rights to use Micromachined catheters in that context.

### Defendants Inflated Monthly Sarcos Charges to PVS

32.    Moreover, on numerous occasions, Jacobsen, Smith and Hansen (the "Individual

Defendants") represented that there would be only nominal charges for PVS's use of Sarcos Inc.

office space and certain personnel. On June 3, 1998, Hansen sent attorneys for Dr. Stertzer a

disclosure schedule representing that PVS pays Sarcos Inc. $22,300 per month for various

services and facilities (including rent, overhead, general, and administrative support). Jacobsen

repeated this representation on June 9, 1998 in a fax to attorneys for Dr. Stertzer, stating that

PVS pays Sarcos Inc. fees that have been as high as $22,300 per month in the past. Jacobsen and

Hansen repeated this representation again to all the Individual Investors on or after June 22, 1998

in Disclosure Schedule 3 to the Stock Purchase Agreement. These representations were

misleading to the Individual Investors at the time because Jacobsen, Smith and Hansen intended

to dramatically increase the amount of Sarcos Inc.'s charges to PVS. Shortly after the Individual

Investors paid $7.5 million for their PVS shares, Jacobsen and Smith caused these monthly

charges to skyrocket over 55% within six months (to $34,580 per month), over 100% within 12

-14-

months (to $47,020 per month), and over 200% within 24 months (to $69,720 per month), in part by overcharging and double charging PVS.

### Defendants Lied About Demand for PVS Stock

33.     Jacobsen also represented to Dr. Stertzer that the Individual Investors needed to act quickly and invest in PVS or else Jacobsen would allow other parties to invest in PVS. Jacobsen also said to Dr. Dorros that another investor already had paid PVS $800,000 simply to look at PVS's books.  These representations were false because PVS only received half of the $800,000 -- Sarcos Inc. received the other half -- pursuant to a standstill agreement with a company that had already decided not to acquire or invest in PVS.  Jacobsen knew at the time he made this representation to Dr. Dorros and Dr. Stertzer that it was false because he had signed the standstill agreement and negotiated with the company that had already decided not to acquire or invest in PVS.

### Defendants Lied to Cover Up a Criminal Investigation

34.     On or after June 22, 1998, Jacobsen, Smith and Hansen caused Sarcos Inc. to represent to the Individual Investors in documents attached to the Stock Purchase Agreement that Sarcos was not a party to, or threatened to be made a party to, any action or investigation of any administrative agency of any federal, state, or local jurisdiction.  Jacobsen, Smith and Hansen made the same representation to attorneys for the Individual Investors in drafts of the agreements transmitted on or about June 11, 17 and 23, 1998.

35.     These representations were false because in January 1996 the U.S. Department of the Navy Naval Criminal Investigative Service Fraud Unit ("NCIS") served a Subpoena Duces Tecum on Sarcos Group L.P. and Sarcos Research Corporation.  Sarcos Group L.P. did not exist

39884.0001\ 182261.1

as a separate entity at the time because it had merged into Sarcos Inc. in late 1994 or early 1995. The Subpoena was directed to Sarcos Research Corporation, its owners, and subsidiaries. Sarcos Research Corporation was a wholly owned subsidiary of Sarcos Inc. at the time. Accordingly, the NCIS subpoena was both directed to and served on Sarcos Inc., in response to which documents were produced and employees were interviewed by NCIS investigators.

36.     In approximately 1997, Sarcos Inc. and Sarcos Research Corporation were further advised by NCIS and the National Aeronautics and Space Administration ("NASA") that those agencies were investigating certain alleged irregularities in the accounting methods used by Sarcos Research Corporation in billing the U.S. government for U.S. Navy and NASA projects. The investigation was ongoing in June 1998 and is still ongoing today.

37.     From 1994 through at least 1999, Jacobsen, Smith and Hansen held key management positions as officers and directors of Sarcos Inc., Sarcos Research Corporation, and/or PVS. Jacobsen, Smith and Hansen knew about the criminal investigation as of June 1998 by virtue of their management positions and because it was frequently the subject of discussion at Sarcos Inc. board meetings they attended.

**The Individual Investors Reasonably Relied on Defendants' Material Misrepresentations**

38.     These and the other misrepresentations described herein were material because they falsely and artificially inflated the actual and perceived value of PVS, its intellectual property and assets, and overstated the integrity of the Individual Defendants while concealing their unscrupulous, if not criminal, business practices. Had the truth been known to the Individual Investors, it would have significantly altered the total mix of information available and would have deterred the Individual Investors' from investing in PVS.

-16-

39.     Relying on these and other material misrepresentations and partial disclosures concerning the value of PVS and its intellectual property, assets and management, the Individual Investors invested $7.5 million in PVS pursuant to a Stock Purchase Agreement dated as of June 22, 1998.  These material misrepresentations damaged the Individual Investors by adversely affecting the value of their investment.

### Unfair License and Assignment Agreements

40.     Contemporaneous with the Stock Purchase Agreement, Jacobsen and Smith -- wearing hats as officers and directors of both Sarcos Inc. and PVS -- negotiated and caused PVS to enter into the Assignment Agreement and the License Agreement  with Sarcos Inc.  Under the Agreements, Jacobsen agreed on behalf of both parties that:  (1) Sarcos Inc. would assign and license various technologies to PVS for exploitation within the Fields of Use; (2) PVS would license the technologies back to Sarcos Inc. on a royalty-free basis for exploitation outside the Fields of Use; and (3) PVS agreed to pay royalties to Sarcos Inc. on sales of any eventual products.

41.     The Agreements were unfair to PVS.  The Agreements do not require Sarcos Inc. to pay any royalties to PVS for licenses of PVS-owned patents, but require PVS to pay royalties to Sarcos Inc. for products derived from PVS-owned patents.  Contrary to the representations and warranties made in the Assignment Agreement, PVS did not even receive all of the intellectual property that Sarcos Inc. purported to assign to PVS; at least six of the 26 invention disclosure files listed as being assigned to PVS were devoid of any substance.  While the Agreements contemplate that PVS will develop and own additional intellectual property in the regular course of its business, Jacobsen forced PVS employees and others paid by PVS to sign employment

agreements that purport to assign all intellectual property to a Sarcos Entity on pain of losing

their annual PVS bonuses in 1999 and 2000, despite Jacobsen's representation to the Individual

Investors in the Stock Purchase Agreement that future employment agreements would include

intellectual property assignment clauses that run in favor of PVS. Although PVS paid most, if

not all, of the salaries of certain employees of Sarcos Entities, Jacobsen included noncompetition

clauses in their employment contracts that potentially apply to PVS.

42.     Jacobsen and Sarcos L.C. had an incentive to harm PVS. If PVS were to have

financial difficulties, then Jacobsen and Sarcos L.C. believed that all intellectual property rights

in PVS technology purportedly transfer to Sarcos L.C. under the Agreements.

43.     The Agreements were so financially significant to Sarcos Inc. that one would

reasonably expect they asserted a significant influence on Jacobsen's judgment when he voted as

a director of PVS to approve them. The Agreements were never ratified by a majority of PVS's

disinterested directors or shareholders after full disclosure of all material conflicts of interest.

44.     PVS is thus damaged by having to comply with draconian licensing provisions.

PVS is losing money because it does not receive license fees for its own technology, while PVS

has to pay royalties for technology it already purchased. PVS also has to go to the capital

markets for new financing with encumbered assets.

### Defendants' Siphoning of PVS Assets and Intellectual Property

45.     As of July 1998, Jacobsen, Lippert, Dr. Dorros, Dr. Stertzer, and Smith were the

directors of PVS. In addition, Jacobsen was Chairman and CEO of PVS and Hansen was PVS's

attorney, corporate secretary and registered agent for service. As such, Jacobsen, Smith, and

Hansen owed the fiduciary duties of good faith, fair dealing, loyalty, honesty, fidelity, disclosure,

and due care to PVS. At this time, Jacobsen, Smith, and Hansen also were officers and/or

directors and/or the attorney of Sarcos Inc. Notwithstanding the Individual Defendants' conflicts

of interest, the disinterested directors of PVS had no reason to doubt the integrity of Jacobsen,

Smith, or Hansen.

46. When PVS was fully funded by a $7.5 million investment from the Individual

Investors, the Individual Defendants began in earnest their plan to plunder PVS of its assets.

Defendants were motivated to despoil PVS because they believed that Sarcos Inc., and later

Sarcos L.C., would purportedly receive all technology previously assigned and licensed to PVS

under the Agreements if PVS were liquidated for any reason.

47. Beginning in July 1998 and continuing during the next two years, the Individual

Defendants breached their duties of loyalty, good faith, honesty and fair dealing when they

improperly: (1) approved the payment of at least 50% of Jacobsen's salary and at least 35% of

Smith's salary by PVS -- neither of which was either approved by the PVS board or objectively

fair and appropriate; (2) caused PVS to pay bonuses to Jacobsen and Smith totaling at least

$100,000 which were not approved by the PVS board and were neither objectively fair or

appropriate; (3) caused Jacobsen's own corporations, namely Sarcos Inc., SIM, Inc. and Sarcos

L.C., to overcharge and double charge PVS for rent, personnel, administrative and other

overhead costs, and professional salaries, by over $750,000; (4) caused employees paid by PVS

to sign agreements with a Sarcos Entity that required those employees to assign their inventions

to Sarcos Entities, including inventions created while working on PVS projects and being paid

PVS money, and to enter into non-compete agreements that potentially applied to PVS; and (5)

skimmed $400,000 off the top of the $7.5 million investment to benefit themselves and the

Sarcos Entities they controlled.

48.     The Individual Defendants also systematically placed intellectual property,

including patents developed and paid for by PVS, into the portfolios of the Sarcos Entities.  For

example in 1996, Clark Davis, a PVS consultant, invented the Micromachine with the assistance

of John Lippert, a PVS officer and employee, while their salaries were paid by PVS.  Jacobsen

listed himself as an inventor on the patent application, and Smith caused the resulting patent to

be assigned to Sarcos Inc. instead of PVS.  The Individual Defendants passed off the

Micromachine as Sarcos Inc.'s intellectual property when they transmitted drafts and final

versions of the Agreements to the Individual Investors and their attorneys on or about May 21,

June 4, and June 22, 1998, and then licensed it back to PVS.  PVS employees invented new

technologies and developed improvements to existing technologies, but Jacobsen and Smith

caused the resulting intellectual property to be owned by a Sarcos Entity instead of PVS.

Jacobsen and Smith also caused Sarcos L.C. to conceal or fail to timely disclose new

technologies and improvements to existing technologies licensed or assigned to PVS.  The

Individual Defendants, acting through the Sarcos Entities they controlled, exploited the unfair

Agreements and garnered unlawful royalties and profits from PVS as a result of this fraudulent

practice.

49.     In January 1999, the Individual Defendants also caused the invalid transfer of

Sarcos Inc.'s interests in intellectual property agreements and intellectual property to Sarcos L.C.

(formerly known as S. Jacobsen L.C.).  This transfer was not permissible without the consent of

PVS.  The Individual Defendants failed to timely disclose the transfer, and PVS never consented

-20-

to it.  PVS paid most, if not all, of the costs associated with the acquisition of the transferred

intellectual property (*e.g.*, research and development, attorney fees, patent prosecution and filing

fees).  By the transfer, the Individual Defendants stripped PVS of a valuable corporate

opportunity relating to PVS's business and breached their respective fiduciary duties to PVS.

50.     In January 1999, Jacobsen and Smith also caused Sarcos Inc. to declare the

company's first ever dividend, in the amount of $350,000, despite a longstanding company

policy against doing so.  The timing of the dividend was no coincidence.  Jacobsen and Smith

caused Sarcos Inc. to declare the dividend to facilitate their secret raid on the company's assets.

Jacobsen owned slightly less than two-thirds of Sarcos Inc.'s stock at this time.  Jacobsen used

Sarcos Inc.'s money from his share of the dividend to pay less than fair value for the transfer of

substantially all Sarcos Inc. assets to Sarcos L.C. (formerly known as S. Jacobsen L.C.), a newly

formed entity that was 100% owned and controlled by Jacobsen.  Defendants failed to make a

full and timely disclosure to all of the Sarcos Inc. shareholders of all material facts and conflicts

of interest concerning the transfer of Sarcos Inc.'s assets, and the Sarcos Inc. shareholders never

voted on, much less approved, the transfer as required by the company's articles of incorporation.

Without such disclosures and approval by the Sarcos Inc. shareholders, the January 1999

attempted transfer of assets to Sarcos L.C. is null and void.  All Sarcos Inc. assets, including its

intellectual property and rights under the Agreements, became assets of PVS when Sarcos Inc.

merged (under the name SIM, Inc.) into PVS in December 1999.

51.     Hansen effectuated these self-dealing transactions by negotiating and drafting

agreements that were unfair to PVS, and by failing to bring Jacobsen's, Smith's, and Hansen's

conflicts of interest and breaches of fiduciary duties to the attention of the PVS board of

-21-

directors. Hansen, as attorney for PVS, also failed to advise PVS of the need for independent intellectual property counsel, in breach of his fiduciary duties. The firm of Thorpe North & Western LLP in Salt Lake City, Utah represented both PVS and the Sarcos Entities in intellectual property matters -- a fact known to Hansen. Recognition of this conflict has led Thorpe North & Western LLP to belatedly withdraw from representing both parties.

52.     Defendants were able to complete these unfair and self-dealing transactions by having employees of various Sarcos Entities, principally Jacobsen, Smith or John Grennan, create "invoices" and spreadsheet "backups" for the charges on behalf of Sarcos Inc. and Sarcos L.C., and then by having Jacobsen, or other Sarcos Inc. and Sarcos L.C. employees under Jacobsen's direction, approve the invoices on behalf of PVS. Defendants caused Sarcos employees to pay these "invoices" with PVS's accounts even though there was never any written contract or lease to support their payment. In substance, Sarcos employees paid Sarcos Entities with PVS's money.

53.     Jacobsen used threats, intimidation, and manipulation to accomplish his schemes. Jacobsen threatened to terminate PVS employees who questioned his practices or instructions. Jacobsen's threats of termination were particularly potent because, by virtue of contractual buy-back provisions in the employees' stock purchase agreements, the employees would lose their shares and stock options if they were terminated for any reason. This effectively intimidated employees into silence and compliance. Jacobsen also was a yeller and screamer who would shout down those who differed or disagreed with him. In at least one case, he struck someone who disagreed with him. Employees were intimidated by Jacobsen and wary of being perceived as crossing him. On the few occasions when he was questioned, Jacobsen, with the

-22-

assistance of Smith or Hansen, concocted seemingly innocuous rationales for questioned actions, thus manipulating people into doing actions that they had questioned.

54.     As a result of this unfair and self-dealing scheme, the Defendants were unjustly enriched.  The transactions discussed above contain unfair terms for PVS.  For example, the PVS board and shareholders never knew about the officers' salaries and bonuses and never would have approved such inappropriate actions had they been disclosed.  Knowing that their actions were unlawful, Defendants concealed evidence of their wrongdoing by burying data revealing their overcharges and other self-dealing transactions in the back of lengthy reports which were supposed to be -- but invariably were not -- presented to the board.  Additionally, the Sarcos Entities never have turned over many PVS records to PVS, but upon information and belief, maintain them in Sarcos facilities instead.  A majority of disinterested directors and shareholders never ratified any of these transactions after full disclosure.  When finally confronted with Sarcos Entity overcharges and double charges, Sarcos L.C. and Jacobsen admitted that the "invoices" were unfair by cutting in half then-outstanding invoice amounts for overhead and personnel services.

### PVS's Discovery Of Defendants' Misconduct

55.     Plaintiffs had no notice of any facts that would cast doubt on the integrity of Jacobsen, Smith or Hansen and thus reasonably relied on them as fiduciaries of PVS.

56.     In August 2000, PVS hired Glenn Foley to serve as its new chief executive officer in order to steer PVS into becoming a public corporation or to orchestrate a successful sale of the company.  Through Foley's internal audit of PVS, Foley and the PVS directors learned of

-23-

Jacobsen's misrepresentations and fraudulent actions.  PVS and the Individual Investors did not discover the exclusions to the Fields of Use until a few months prior to filing this lawsuit.

57.    In December 2000, PVS moved out of the Sarcos L.C. building, and the billing to PVS ceased.  Hansen was removed as Secretary as of July 6, 2000, when Smith took over the position, and Hansen resigned as registered agent on February 20, 2001.  On January 5, 2001, Smith and Jacobsen resigned from the PVS board.

## FIRST CAUSE OF ACTION

*(Securities Fraud - 15 U.S.C. § 10(b) and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5)*

58.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 57 as if set forth fully herein.

59.    Defendants, in connection with the purchase or sale of securities, made the foregoing statements, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

60.    Defendants, by their conduct, committed violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 thereunder in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or failed to state material facts necessary in order to made statements made, in light of the circumstances, not misleading; or

(c)  Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs.

61.  Plaintiffs had no notice of any facts that would cast doubt on the integrity of Defendants as fiduciaries of Plaintiffs and thus reasonably relied on the foregoing misstatements and omissions.

62.  Plaintiffs would not have entered into the foregoing transactions for the price paid, if at all, if they had known the truth of the foregoing misstatements and omissions.

63.  The foregoing misstatements and omissions directly and proximately caused Plaintiffs' injuries.

## SECOND CAUSE OF ACTION

*(Control Person Liability - 15 U.S.C. § 20(a))*

64.  Plaintiffs repeat and reallege the allegations in paragraphs 1 through 63 as if set forth fully herein.

65.  The Individual Defendants are jointly and severally liable with, and to the same extent as, the Sarcos Entities they controlled, pursuant to Section 20(a) of the Securities Exchange Act of 1934.

## THIRD CAUSE OF ACTION

*(Violation of Utah's Uniform Securities Act - Utah Code Ann. § 61-1-1, et seq.)*

66.  Plaintiffs repeat and reallege the allegations in paragraphs 1 through 65 as if set forth fully herein.

67.  By their conduct, Defendants violated the Utah Uniform Securities Act, Section 61-1-1, *et seq.*

39884.0001\ 182261.1

68.     Defendants, in connection with the purchase or sale of securities, directly or indirectly made false statements of material fact or omitted to state material facts necessary in order to make the statements made not misleading.

69.     Defendants' conduct was intentional or reckless.

70.     Plaintiffs did not know and did not have reason to know the falsity of the foregoing misstatements and omissions.

71.     Plaintiffs had no notice of any facts that would cast doubt on the integrity of the Individual Defendants as fiduciaries of Plaintiffs, and thus Plaintiffs reasonably relied on the foregoing misstatements and omissions.

72.     Plaintiffs would not have entered into the foregoing transactions for the price paid, if at all, if they had known the truth of the foregoing misstatements and omissions.

73.     The foregoing misstatements and omissions directly and proximately caused Plaintiffs' injuries.

### FOURTH CAUSE OF ACTION

*(Fraudulent Concealment)*

74.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 73 as if set forth fully herein.

75.     Defendants knowingly or recklessly concealed the foregoing presently existing material facts for the purpose of inducing Plaintiffs to act without knowledge thereof.

76.     Defendants had a duty to disclose the foregoing omitted facts.

77.     Plaintiffs lacked knowledge of the foregoing omitted facts and reasonably relied upon their nonexistence.

-26-

78.     Defendants' concealment of material facts directly and proximately caused

Plaintiffs' injuries.

## FIFTH CAUSE OF ACTION

### *(Fraudulent Misrepresentation)*

79.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 78 as if set

forth fully herein.

80.     Defendants knowingly or recklessly made the foregoing misstatements to

Plaintiffs concerning presently existing material facts for the purpose of inducing Plaintiffs to act

thereupon.

81.     Plaintiffs reasonably relied on the foregoing misstatements without knowledge of

their falsity.

82.     The foregoing misstatements directly and proximately caused Plaintiffs' injuries.

## SIXTH CAUSE OF ACTION

### *(Breach of Fiduciary Duties)*

83.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 82 as if set

forth fully herein.

84.     Jacobsen, as a director and chief executive officer of PVS, owed fiduciary duties

of good faith, fair dealing, loyalty, honesty, fidelity, disclosure, and due care to PVS at all times

relevant for purposes of this action.  Simultaneous with his positions at PVS, Jacobsen was the

president and a director of Sarcos Inc., SIM, Inc. and Sarcos L.C. as well as many, if not all, of

the Sarcos Entities.

85.     Smith, as a director and corporate secretary of PVS, owed fiduciary duties of good faith, fair dealing, loyalty, honesty, fidelity, disclosure, and due care to PVS at all times relevant for purposes of this action.  Simultaneous with his positions at PVS, Smith was an officer and/or director of Sarcos Inc., SIM, Inc., and Sarcos L.C.

86.     Hansen, as corporate secretary and attorney for PVS, owed fiduciary duties of good faith, fair dealing, loyalty, honesty, fidelity, disclosure, and due care to PVS at all times relevant for purposes of this action.  At the same time, Hansen served as attorney for Sarcos Inc., SIM, Inc., and Sarcos L.C.  Hansen failed to make full disclosure to PVS of conflicts of interest implicated by his simultaneous representation of these entities.  PVS never consented to waive any conflict of interest.

87.     Jacobsen, Smith and Hansen failed to perform their respective fiduciary duties in good faith and with ordinary prudence in the best interests of Plaintiffs.

88.     The conduct of Jacobsen, Smith and Hansen was never approved by a majority of PVS disinterested directors or shareholders after full disclosure.

89.     Jacobsen, Smith and Hansen's conduct constitutes gross negligence, willful misconduct, or intentional infliction of harm on Plaintiffs.

90.     Jacobsen, Smith, and Hansen breached their respective fiduciary duties to Plaintiffs.

91.     The breaches of fiduciary duties owed by Jacobsen, Smith and Hansen have directly and proximately caused Plaintiffs' injuries, including but not limited to increased operating costs, decreased value of PVS and its assets, and the loss of valuable corporate opportunities rightfully belonging to PVS.

## SEVENTH CAUSE OF ACTION

### *(Conversion)*

92.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 91 as if set forth fully herein.

93.     Defendants intentionally exercise control over intellectual property and other assets owned by Plaintiffs.

94.     Defendants' conduct directly and proximately caused Plaintiffs' injuries, including but not limited to lost profits and lost assets.

## EIGHTH CAUSE OF ACTION

### *(Accounting and Disgorgement)*

95.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 94 as if set forth fully herein.

96.     Defendants' conduct was deliberate, malicious, tortious, and illegal.

97.     Defendants Jacobsen, Smith, and the Sarcos Entities, must be required to account for and disgorge all salary, bonuses, benefits, and/or profits from the date of their first act of their misconduct to the present.

98.     Hansen must be required to account for and disgorge all salary, bonuses, benefits, and/or profits earned by Hansen or his law firm from the date of his first act of misconduct to the present.

39884.0001\ 182261.1

## NINTH CAUSE OF ACTION

*(Declaratory Judgment - Intellectual Property Rights Belong To PVS)*

99.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 98 as if set forth fully herein.

100.    Plaintiffs and Defendants dispute ownership of the relevant interests in intellectual property.

101.    Plaintiffs contend the relevant interests in intellectual property belong to PVS and not to Sarcos L.C., which Defendants deny.

102.    Plaintiffs are entitled to an order declaring that the relevant interests in intellectual property belong to PVS, and requiring Sarcos to transfer all right, title and interest, and to grant license rights to PVS, as appropriate.

## TENTH CAUSE OF ACTION

*(Declaratory Judgment - Sarcos Employment Agreements Are Invalid)*

103.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 102 as if set forth fully herein.

104.    Plaintiffs and Defendants dispute the validity of noncompetition and invention clauses in Sarcos employment agreements for employees who were paid by PVS.

105.    Plaintiffs contend the relevant employment agreements are invalid and unenforceable, which Defendants deny.

106.    Plaintiffs are entitled to an order declaring that the relevant noncompetition agreements are invalid and unenforceable.

39884.0001\ 182261.1

## ELEVENTH CAUSE OF ACTION

*(Declaratory Judgment - Fields of Use Exclusions Not Part of Agreements)*

107.   Plaintiffs repeat and reallege the allegations in paragraphs 1 through 106 as if set forth fully herein.

108.   Plaintiffs and Defendants dispute whether the exclusions to the Fields of Use are part of the Agreements.

109.   Plaintiffs contend the exclusions are not part of the Agreements, which Defendants deny.

110.   Plaintiffs are entitled to an order declaring that the exclusions to the Fields of Use are not part of the Agreements, are invalid and/or are unenforceable.

## PRAYER FOR RELIEF

WHEREFORE, PVS respectfully requests this Court to enter judgment against Sarcos L.C., Jacobsen, Smith, Hansen and the Sarcos Entities and hereby award PVS:

1.   Actual damages;

2.   Punitive damages;

3.   Double or treble damages as provided by law;

4.   An accounting and disgorgement of all unlawfully earned profits;

5.   An accounting and disgorgement of all salary, bonuses, benefits and profits paid to Jacobsen, Smith and Hansen from the date of the first breach of their fiduciary duties;

6.   Declaratory judgment that PVS is the rightful owner of the relevant intellectual property;

7.     Declaratory judgment that the relevant Sarcos employment agreements are invalid and unenforceable;

8.     Declaratory judgment that the purported exclusions to the Fields of Use are not part of the Agreements, are invalid and/or are unenforceable;

9.     An order setting aside the transfer or assignment of intellectual property from SIM, Inc. to Sarcos L.C. as void for lack of consideration and as against public policy;

10.    Injunctive relief designed to prevent Defendants from continuing to infringe PVS's patents;

11.    Injunctive relief designed to prevent Defendants from continuing their pattern of tortious and illegal conduct;

12.    Pre-judgment and post-judgment interest as provided by law;

13.    Costs of prosecuting this lawsuit, including reasonable attorneys' fees; and

14.    Such other and further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiffs respectfully request that all issues of fact be tried before a jury.

DATED this 12th day of September, 2001

        Alan L. Sullivan
        Michael D. Zimmerman
        Todd M. Shaughnessy
        SNELL & WILMER L.L.P.
        15 West South Temple, Suite 1200
        Gateway Tower West
        Salt Lake City, Utah  84101-1004
        Telephone:  (801) 257-1900
        Facsimile:  (801) 257-1800

        Charles R. Work
        Kenneth L. Cage
        Daniel A. Mullen
        Douglas G. Edelschick
        McDERMOTT, WILL & EMERY
        600 13th Street, N.W.
        Washington, D.C.  20005-3096
        Telephone:  (202) 756-8000

By: _____
        Attorneys for Plaintiffs

39884.0001\ 182261.1

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of September, 2001, a copy of the foregoing FIRST

AMENDED COMPLAINT AND JURY DEMAND was served, via hand-delivery, upon the

following:

>    Richard D. Burbidge
>    Burbidge & Mitchell
>    139 East South Temple
>    Suite 2001
>    Salt Lake City, Utah  84111-1103
>
>    Robert L. Stolebarger
>    Holme Roberts & Owen, LLP
>    111 East Broadway, Suite 1100
>    Salt Lake City, Utah  84111

39884.0001\ 182261.1